**TRANSWESTERN PIPELINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 84–4753.

United States Court of Appeals, Fifth Circuit.

March 7, 1986.

---

James W. McCartney, Vinson & Elkins, Judy M. Johnson, Houston, Tex., for petitioner.

John H. Conway, Atty., Jerome Feit, Sol., F.E.R.C., A. Karen Hill, Atty., Washington, D.C., for respondent.

Michael D. Gayda, E.R. Island, Los Angeles, Cal., for Pacific Lighting Gas Supply Co. and Southern California Gas Co.

Janice E. Kerr, J. Calvin Simpson, Michael B. Day, San Francisco, Cal., for The State of Cal. and The Public Utilities Com'n of the State of Cal.

J.D. Steelman, Tulsa, Okl., Dale A. Wright, Gregory Grady, Washington, D.C., for Northwest Central Pipeline Corp.

Before CLARK, Chief Judge, BROWN, and JOHNSON, Circuit Judges.

CLARK, Chief Judge:

Transwestern Pipeline Company (Transwestern) challenges an order of the Federal Energy Regulatory Commission (the Commission) denying Transwestern's attempt to recover costs incurred in developing an unsuccessful synthetic gas project by including these costs in its rates over a five-year period. Finding that Transwestern is barred from recovering these costs by the certificates of public convenience and necessity which authorized the synthetic gas project, we deny the petition for review.

I

Transwestern is engaged in the transportation and sale for resale of natural gas in interstate commerce and is regulated by the Commission under the Natural Gas Act of 1938. See 15 U.S.C. § 717(b) (1982). It purchases the majority of its gas through transmission facilities located in Texas, Oklahoma, New Mexico and Arizona, and makes sales to two principal customers, Pacific Lighting Gas Supply (PLGS) and Northwest Central Pipeline Company (NWC).

In response to the threat of an increasingly inadequate gas supply in the early 1970s, Transwestern and PLGS developed a joint venture called the Western Coal Gasification Company (WESCO). The purpose of WESCO was to construct a plant that would convert coal into synthetic gas.

On February 7, 1973, WESCO applied to the Commission for certificates of public convenience and necessity to authorize construction and operation of coal gasification facilities in San Juan County, New Mexico and the sale of approximately 250,000 Mcf per day of gas derived from the coal gasification project. Transwestern concurrently filed for authorization to construct and operate approximately sixty-seven miles of pipeline and appurtenances for the transportation of the coal gas and the resale of coal gas in a comingled stream in interstate commerce. However, the Commission refused to issue any of the required certificates because it determined that the WESCO project would produce artificial gas within the meaning of Section 2(5) of the Natural Gas Act, 15 U.S.C. § 717a(5) (1982), and that, therefore, the coal gasification plant, the facilities for the transportation of the artificial gas when unmixed with natural gas and the sale of this unmixed gas were all outside the Commission's jurisdiction.

WESCO then filed an amended application seeking authorization for the sale of comingled synthetic and natural gas to

Transwestern customers. In *Transwestern Pipeline Company,* 53 FPC 1287 ("Opinion No. 728"), *as modified* 54 FPC 2418 (1975) ("Opinion No. 728-A"), *aff'd on other grounds sub. nom. Silentman v. FPC,* 566 F.2d 237 (D.C.Cir.1977), the Commission concluded that although it lacked jurisdiction over the project itself it could nonetheless assert jurisdiction over the rate to be charged for the sale of comingled gas. It also found that the WESCO project was "an absolute necessity for the consumers in California and the Midwest, absent the availability of equivalent sources." The Commission issued certificates authorizing the WESCO sponsors "to make the transfers, sales and deliveries, and to build, connect, maintain and operate the facilities proposed and required to effectuate the transfers, sales, deliveries and transportation so authorized." In Opinion No. 728-A the Commission gave the WESCO applicants six months within which to accept the certificates; during this time the applicants were to seek the necessary financing and approval from the California Public Utilities Commission (CPUC).

The principal issue in both Opinions No. 728 and 728-A was the pricing of the gas to be produced by the WESCO project. The WESCO applicants sought Commission approval of a tariff that would pay "the sellers' total cost of service, including a 15% return on equity, regardless of the amount of gas delivered." They maintained that the only way to obtain financing for an expensive and experimental project such as WESCO was through a full cost of service tariff.

The Commission did not adopt a full cost of service tariff. Instead, in Opinion No. 728, it adopted the proposal submitted by CPUC. Under this scheme all WESCO gas produced during the first six months of the plant's operations would be sold at a price of $1.38 per Mcf. Following this period, there would be a Section 4 proceeding[1] in which new rates would be established; these new rates would be such as to allow the applicants to recover all costs which

they could show had been reasonably and prudently incurred. The Commission further determined that neither a minimum bill provision (i.e., a provision allowing the seller to bill the buyer for certain expenses despite a total failure of deliveries) nor a penalty provision (i.e., a provision penalizing the seller for falling short of expected production) should be established at that time, but it indicated that it would consider the merits of such provisions at the time that the WESCO plant began testing operations. Finally, the Commission found that the proper rate of return for the project was 15%, as the WESCO applicants urged, rather than the 13% return suggested by CPUC and the Commission staff.

The WESCO participants, in their application for rehearing, vigorously objected to Opinion No. 728. They flatly stated that the cost recovery mechanism adopted by the Commission would not permit financing of the project. The essential defect of Opinion No. 728, in their view, was that the new rates would not be set until a Section 4 hearing was held; this left the investors exposed to all the risks of regulatory lag, including the possibility that the price set in the Section 4 hearing would be based on a production level which the seller would subsequently be unable to meet due to factors "such as strikes, congressional limitations on strip mining and mechanical breakdown of facilities." Furthermore, the Commission's refusal to decide the minimum bill and penalty provision questions before the plant was constructed was seen by the applicants as unrealistic. They argued that "[n]o responsible investor can reasonably be expected to commit funds to a project of this nature, which to use the Commission's expression is 'experimental,' where the Commission has undertaken to reserve determination on whether and to what extent the recovery will be allowed of funds which have already been committed and expended." The applicants concluded that it would only be possible to continue the project if the Commission approved a per Mcf rate adequate to recover all costs

---

1. *See* 15 U.S.C. § 717c (1982).

at the expected production level. This rate would supersede the start-up rate and could be suspended only for one day for a hearing to determine if the costs in question had been reasonably and prudently incurred. The applicants also submitted minimum bill and penalty provisions that they indicated might reduce investors' risk to an acceptable level.

In Opinion No. 728–A the Commission responded to the concerns raised by the WESCO applicants. It raised the start-up rate from $1.38 to $2.50 per Mcf. It also reduced the suspension period of the new rates (i.e., the rates proposed by applicants to replace the start-up rates at the end of the testing period) to one day, as requested by applicants. Although it rejected the minimum bill and penalty provisions submitted by WESCO, the Commission devised alternative provisions which it believed would adequately protect the ratepayers.

Following the issuance of the certificates in Opinion No. 728, as modified by Opinion No. 728–A, Transwestern continued the development of the WESCO project. However, within a short period of time the WESCO project had to be abandoned because Transwestern was unable to negotiate an agreement with the Navajo Tribe on whose lands the coal gasification plant was to have been located. Since Transwestern could not continue the project, it never accepted the certificate.

In its filing for a rate increase on August 31, 1978, Transwestern included a test period amount of $15,573,664.00 in rate base attributable to the WESCO coal gasification project and included in its cost of service a return and taxes on this sum. The Commission permitted Transwestern to put these rates into effect, subject to refund, and set the matter for further hearing. Subsequently Transwestern adopted an alternative position in which it sought recovery of costs without return and taxes through a five-year amortization program.

For the purposes of the hearing, all parties stipulated that the costs incurred by Transwestern in connection with the WESCO project were "reasonable and were prudently incurred" and that such costs were "incurred in the furtherance of Transwestern's efforts to increase its gas supply."

On March 3, 1981, the Administrative Law Judge (ALJ) issued his initial decision denying both Transwestern's requests for rate base treatment of the WESCO costs and for amortization of such costs. The ALJ concluded that rate base treatment was inappropriate because the project was not sufficiently experimental, novel or innovative to qualify for research and development treatment at the time the project was initiated. The ALJ also concluded that amortization should not be allowed for two reasons. First, he found that Transwestern had not shown that it had actually incurred these costs. Second, he found that established Commission policy prohibited the amortization of costs from failed synthetic gas projects.

On appeal to the Commission, Transwestern withdrew its claim for rate base treatment and pursued only its request to amortize the WESCO costs. The Commission, however, affirmed the ALJ's decision on the basis of its holding in *Natural Gas Pipeline Co.*, 27 FERC ¶ 61,201, *reh'g denied*, 28 FERC ¶ 61,020, *aff'd sub nom. Natural Gas Pipeline Co. v. FERC*, 765 F.2d 1155 (D.C.Cir.1985). In *Natural Gas*, the Commission held that the pipeline company was not entitled to recover costs associated with three unsuccessful gas supply projects, including as proposed synthetic gas facility. Transwestern challenges the Commission's decision, arguing both that the policy embodied in the *Natural Gas* case is invalid and that that policy is inapplicable to the present case because of the certification of the WESCO project.

II

Transwestern argues that the Commission's policy of disallowing recovery of costs reasonably and prudently incurred in the development of unsuccessful gas projects is contrary to fundamental public utility law and constitutes confiscation in violation of the due process clause of the United States Constitution. Transwestern

states that a public utility is entitled to recover all reasonable and prudent expenses incurred for the benefit of its jurisdictional customers. Furthermore, it contends that the Commission's policy is arbitrary and discriminatory in that natural gas companies are treated differently from electric utilities, which are permitted to recover costs associated with unsuccessful energy supply projects.

Even if the Commission's policy is not itself confiscatory or arbitrary, Transwestern maintains that the application of that policy here was arbitrary in light of the Commission's failure to address the difference between the instant case and prior cases in which the policy had been applied. Specifically, Transwestern points to the fact that the project in this case was certificated. Therefore, it argues, the rationale for disallowing cost recovery with respect to failed gas projects does not apply. Unlike the gas from an uncertificated project, any gas produced by the WESCO plant was certain to accrue to the benefit of jurisdictional customers. Furthermore, the Commission cannot argue that the project was speculative when the Commission itself authorized the project.

In response, the Commission cites the decision of the Circuit for the District of Columbia in *Natural Gas Pipeline v. FERC*, 765 F.2d 1155 (D.C.Cir.1985), which upheld the identical policy which Transwestern challenges here. In that case the court refused to strike down as arbitrary the Commission's decision to disallow recovery of expenses reasonably and prudently incurred in developing several unsuccessful gas projects, including a synthetic gas facility. *Id.* at 1164. The court also rejected an attack on the Commission's decision based on its alleged inconsistency "with Commission decisions allowing recovery of costs for unsuccessful pipeline storage projects, dry holes drilled by natural gas producers, and unsuccessful electrical generation projects." *Id.* at 1164–68. Furthermore, the Commission points out that the *Natural Gas* decision did not rest on the non-jurisdictional character of the projects in question; even where the

project, if unsuccessful, was guaranteed to benefit jurisdictional customers, the court approved the Commission's "policy to deny a natural gas pipeline any recovery of costs from supply projects that entirely failed to benefit ratepayers." *Id.* at 1163. Finally, the Commission argues that even if the jurisdictional character of the project were to be considered dispositive, the failure of the WESCO participants to accept the certificate in this case establishes that the WESCO project would not have necessarily benefitted jurisdictional customers.

We need not address the broader questions raised by the arguments of Transwestern and the Commission because Transwestern's attempt to recover the WESCO costs is barred on narrower grounds. In its application for certification of the WESCO project Transwestern vigorously advanced the position that financing of the project required that investors be aware, *at the time of the certification,* of the allocation of risk between ratepayers and the WESCO participants. The Commission implicitly accepted this position in Opinion No. 728–A by adopting certain minimum bill and penalty provisions, thus modifying its Opinion No. 728, which would have postponed adoption of such provisions until after the completion of the WESCO plant. However, neither Opinion No. 728 nor Opinion No. 728–A contains any suggestion that the WESCO participants would be entitled to recover costs through amortization if the project failed.

Although Transwestern concedes that the Commission's orders in Opinions No. 728 and 728–A did not guarantee the recovery of costs in the event the project failed, it contends that the orders did not foreclose the recovery of such costs either. Transwestern argues that the issue simply did not arise in the certification procedure.

We cannot accept Transwestern's interpretation of the Commission's orders for two reasons. First, there is direct evidence that Transwestern was aware, at the time of certification, that the orders did not permit recovery of the costs at issue here.

After Opinion No. 728 was issued Transwestern received a letter from Citibank which identified as one of the weaknesses of that opinion, from an investor's point of view, that it did not address the possibility of non-completion. However, in its application for rehearing, Transwestern never attempted to persuade the Commission to guarantee the recovery of any costs in the event that the project failed. Furthermore, in a reply brief on the application for rehearing Transwestern recognized the need for federal government financial participation to cover "residual exposure" and then stated "[o]ne of the most pressing needs is for federal assurance that if the project is not completed for any reasons, construction lenders and investors will get their money back". This statement reflects Transwestern's understanding that the risk of non-completion had not been assumed by the ratepayers and that it would have to seek guarantees from the federal government to protect itself from that risk. Transwestern never received such guarantees.

The second reason for rejecting Transwestern's interpretation of the orders is that it is inconsistent with the approach taken by the WESCO participants toward financing the project. As already noted, Transwestern argued that the risks of the WESCO project needed to be apportioned at the time of certification. It is difficult to believe that Transwestern would ignore the risk of non-completion or allow that risk to be apportioned at a later date. It is more plausible that Transwestern understood that the Commission's orders placed the risk of non-completion on the WESCO participants and that it accepted this risk as part of the downside of a project for which it was to earn a 15% rate of return.[2]

For these reasons, we conclude that the Commission's orders in Opinions No. 728 and 728–A implicitly denied cost recovery in the event that the WESCO project failed. This denial, made at the outset of the WESCO project, controls the disposition of Transwestern's claim for amortization of costs regardless of the proper treatment of such costs had the cost recovery not been initially refused. Transwestern was under no obligation to continue with the WESCO project if it found the terms of the certificates unacceptable.

The Commission has broad authority to condition certificates of public convenience and necessity. *Transcontinental Gas Pipe Line Co. v. FERC*, 589 F.2d 186, 190 (5th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). These conditions may include dividing the risk between ratepayers and shareholders in the event that the project is unsuccessful. *Natural Gas, supra*, 765 F.2d at 1163 n. 10. By denying Transwestern the right to recover the costs at issue here, the Commission in effect placed a condition on the certificates which authorized the WESCO project. Transwestern's challenge to this condition, if any, should have been made on direct appeal of the orders granting the certificates. *See Texaco, Inc. v. FPC*, 290 F.2d 149, 156–57 (5th Cir.1961) (order granting a temporary certificate with conditions that aggrieved petitioners was then appealable and the failure to timely appeal barred later challenge of the conditions).

A similar case was presented in *Tennessee Gas Pipeline Co. v. FPC*, 487 F.2d 1189 (D.C.Cir.1973). Although the original certificate of public convenience and necessity did not explicitly deny recovery of costs in the event that the liquified natural gas project failed, the court concluded that the

2. The Commission has contended before us that the initial cost of service tariff sought by Transwestern and denied by the Commission would have guaranteed Transwestern recovery of costs in the event of non-completion. This interpretation, if correct, would provide additional support for our conclusion that Opinions No. 728 and 728–A implicitly deny cost recovery in the situation presented in this case. Transwestern, however, maintains that the cost of service tariff would have had no application in this situation. On the record before us it is difficult to determine whether the cost of service tariff would apply in the event of non-completion. We need not reach this issue and do not.

cost recovery mechanism approved by the certificate implicitly prohibited the recovery of costs in this situation. *Id.* at 1197. Tennessee Gas sought rate base treatment of these costs as either research and development expenses or as extraordinary property losses. The court held that regardless of whether the costs were qualified under either of these categories, "the restrictions in the original certificate were properly construed to bar inclusion of these unrecovered costs in Tennessee's rate base." *Id.* at 1196. In the instant case the certificates authorizing the WESCO project likewise base recovery of the costs sought by Transwestern.

### III

For the reasons set forth in this opinion we find that Transwestern is not entitled to recover from its ratepayers the costs it incurred in developing the WESCO project. Accordingly, the petition for review is

DENIED.